UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                  :
JOSEPH MARIANO, JR.               :
                                  :
v.                                :   CIV. NO. 3:08CV1738 (JCH)
                                  :
MICHAEL J. ASTRUE,                :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION                    :
                                  :
```

RECOMMENDED RULING

This action, filed under §205(g) of the Social Security Act ("the Act"), 42 U.S.C. §405(g), seeks review of a final decision of the Commissioner of Social Security ("the Commissioner"), in which he found that the plaintiff was not entitled to Supplemental Security Income ("SSI") benefits because, despite his impairments, he had the residual functional capacity ("RFS") to perform a range of sedentary work that allowed him to perform jobs that existed in significant numbers in the national economy.

For the reasons that follow, plaintiff's Motion for Order Reversing the Decision of the Commissioner [**Doc. #22**] is **DENIED.** Defendant's Motion for Order Affirming the Decision of the Commissioner [**Doc. #24**] is **GRANTED.**

ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for Supplemental Security Income ("SSI"), alleging disability on April 22, 2005 (Certified Transcript of Record, compiled on April 28, 2009, Doc. #16, (hereinafter "Tr.")(Tr. 53-56)).  He alleged disability since October 27, 2000, as a result of a lower back injury sustained in

an automobile accident. (Tr. 53, 60, 65).  His claim was denied initially and on reconsideration. (Tr. 39, 40, 41-43, 46-48).

On November 2, 2007, Administrative Law Judge (ALJ) Joseph Shortill held a hearing at which Plaintiff, represented by counsel, testified, along with a vocational expert ("VE"), James Parker. (Tr. 183-219).  On November 28, 2007, the ALJ issued a decision denying the claims. (Tr. 10-20).

Plaintiff thereafter appealed the ALJ's decision. On September 23, 2008, the Appeals Council denied plaintiff's request for review (Tr. 4-6). Thus, the ALJ's November 28, 2007, decision is the final decision of the Commissioner, subject to judicial review.  Plaintiff, represented by counsel, has appealed to this Court.

<u>BACKGROUND</u>

Joseph Mariano, Jr., was born on February 20, 1972. (Tr. at 19).  He was thirty-five years old on the date of his administrative hearing. (Tr. 187).  Plaintiff is a high school graduate and attended one year of college. (Tr. 187). Plaintiff graduated from EC Goodman Technical for carpentry.  (Tr. 213). He has past relevant work, <u>see</u> 20 C.F.R. 404.1565(a) and Social Security Ruling ("SSR") 96-8p[1], self-employment as a carpenter.[2] (Tr. 66).  The vocational expert characterized Mariano's carpentry work as skilled work with medium exertional

_____

[1] <u>Available at</u> http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-08-di-01.html.

[2] Plaintiff also testified he worked as a dishwasher and at a pizzeria. (Tr. 156).

requirements. (Tr. 214).

Medical Records

    Physical Health Records

    Plaintiff was injured in a motor vehicle accident on October 27, 2000.[3] (Tr. 191). He was seen following the accident at New Britain General Hospital for complaints of back and neck pain. (Tr. 131-39). Cervical x-rays were negative. (Tr. 136, 141-42). Plaintiff was advised that he could expect to be stiff, sore and aching for several days.[4] (Tr. 132).

    Two days later, plaintiff returned to the emergency room at New Britain General Hospital complaining of acute, moderate back pain and the pain medications he had been given. (Tr. 143-51). His neck appeared normal on inspection and he had painless range of motion in his neck but his back was tender and he complained of pain on motion.

    Plaintiff was seen at the Grove Hill Medical Center on November 9, 2000, with complaints of neck and back pain both of which he rated as a "10" on a ten-point pain scale and complaining that his "entire body is sore." (Tr. 106). On

---

[3]Plaintiff provided a history of the accident which is memorialized in the medical record. According to plaintiff, "he was stopped in front of a parking garage in New Britain at which time a car in front of him had trouble making the curve to go into the gated area, placed [the] car in reverse and hit the patient's car when he was backing up. [Mariano] said he had some damage to his car [with] no damage to the other car." (Tr. 106).

[4]Plaintiff was prescribed Motrin and Flexeril. (Tr. 136, 149).

3

examination, Dr. Gee noted that plaintiff demonstrated "very limited" range of motion in his neck and back and "yells with pain with any slight touch or any motion to the neck or back." (Tr. 106). Straight leg raising was negative; reflexes symmetric; motor testing was 5/5 in the upper and lower extremities; and sensory was intact. (Tr. 106). X-rays of the lumbar spine were negative for any fracture or dislocation. (Tr. 106). Plaintiff was started on Medrol Dosepak with Soma and a course of physical therapy and a re-check was ordered in three weeks. (Tr. 107).

Mariano returned to the Grove Hill Medical Center on December 5, 2000, for a follow-up examination by Dr. Gee. (Tr. 104-05). Dr. Gee noted that plaintiff had attended six sessions of physical therapy but had not progressed. (Tr. 104). Plaintiff rated his neck and back pain at a ten out of ten. (Tr. 104). He was tender throughout cervical region and trapezii; reflexes intact; manual motor testing upper and lower extremities was 5/5; moderate straight leg raise on both sides; and tender over lower lumbar region. (Tr. 104). Dr. Gee diagnosed cervical and lumbar strain without evidence of neurological compromise. (Tr. 104). Plaintiff was prescribed Vicodin and Medrol Dosepak. (Tr. 104). Dr. Gee recommended that plaintiff see Dr. Pepperman, a physiatrist, depending on the results of his MRI findings. (Tr. 105.

On December 5, 2000, complaining of bilateral radiation of pain into his lower extremities, plaintiff was seen by Dr. Krompinger at Orthopedic Associates of Hartford, Inc., for a

4

second opinion .  (Tr. 111-12).  After examination, Dr.
Krompinger assessed that plaintiff had "rather global pain"
without "any clinical signs of radiculopathy."[5]  (Tr. 112).
"There appears to be signs of symptom magnification. I would
agree with Dr. Gee's recommendation of doing an MRI but I do not
suspect any other specific intervention would be called for
unless a dramatic finding was noted on the MRI."  (Tr. 112).

Plaintiff had an MRI of his lumbar spine on January 5, 2001.
(Tr. 108-09).  There was a mild concentric disc bulge at L3-4, a
minimal concentric disc bulge at L4-L5, and a minimal left
paracentric disc bulge at L5-S1. (Tr. 108-09).

On January 19, 2001, plaintiff returned to the Grove Hill
Medical Center for an appointment with Dr. Pepperman, for a
physiatry evaluation and pain management. ( Tr. 102-03).  Dr.
Pepperman indicated that the MRI was "essentially normal, only
some disc bulges, no herniated disc."[6]  (Tr. 102).  Plaintiff
exhibited "significant grimacing, wincing and audible moaning
during any kind of maneuver of the cervical or lumbar region"
even after a few degrees.  (Tr. 103).  Dr. Pepperman explained,

> that the MRI is normal.  The patient was
> incredulous. The patient then asked me for
> pain medications. I told him I do not believe
> he requires any kind of pain medication

---

[5]"Radiculopathy is a condition due to a compressed nerve in
the spine that can cause pain, numbness, tingling, or weakness
along the course of the nerve. Radiculopathy can occur in any
part of the spine, but it is most common in the lower back
(lumbar radiculopathy) and in the neck (cervical radiculopathy)."
Http://www.medicinenet.com/radiculopathy

[6]Vicodin and Skelaxin were prescribed. (Tr. 102).

> whatsoever.  The patient then wanted to
> continue to stay out of work.  I told him my
> medical opinion is that he should be working
> full-time, full duty.  Once again, the
> patient was surprised and disbelieving.
> . . .
> [Dr. Gee] agrees with me wholeheartedly that
> this patient has symptom magnification. He
> also agrees that the MRI findings are normal.
> He also agrees the patient does not need any
> more painkillers, and the patient should be
> working full-time, full duty.
> I do not feel this patient is a candidate for
> trigger point injections. I feel they would
> be useless and fruitless. I do not believe he
> requires further physical therapy, nor do I
> believe he requires any more medical follow-
> up here at the office.

(Tr. 103).

On February 2, 2001, plaintiff returned to Grove Hill Medical Center and was seen by Dr. Gee, who informed plaintiff that his "MRI shows a bulging disc without any frank herniation or significant findings"; "this is probably just some normal variant . . . [with] no pathologic correlation." (Tr. 101).  No further treatment was required; plaintiff could return to work; the patient had had complete and adequate care for his complaints.  (Tr. 101).  Dr. Gee added, "[t]he patient is unhappy with this evaluation and tells me he is seeking a second opinion."  (Tr. 101).

On February 28, 2001, plaintiff returned to Dr. Krompinger. (Tr. 113-14). A flexion/extension lateral lumbosacral spine film was negative. (Tr. 113). Dr. Krompinger told plaintiff that his level of symptoms was out of proportion to the diagnostic findings and set up a bone scan to rule out other pathological process with a return thereafter for reevaluation. (Tr. 113).

On March 20, 2001, plaintiff returned to Dr. Krompinger for reassessment. (Tr. 115-16).  Plaintiff's bone scan was "essentially a normal study."  (Tr. 115). Apparently plaintiff "called the office complaining that he was not given a narcotic pain medication . . . [and] ongoing central back pain with numbness involving his foot and ankle area." (Tr. 115). Dr. Krompinger did not recommend "any other specific intervention" stating, that "[a]t this point I am the 4th physician that he has seen, although he tells me he did not see any spine consultants prior to my evaluation.  I have recommended that he get another opinion in this matter because frankly I do not feel any other specific intervention would have a high predictability of helping him.  He comes in today with a quad cane and his degree of expressed disability appears to be out of proportion to our objective findings to date."  (Tr. 116).

The record contains no further medical care until plaintiff had another MRI on March 16, 2005.  (Tr. 117).  When plaintiff applied for benefits, he reported that this MRI was his only recent medical treatment.[7] (Tr. 67-68).  The MRI showed minor dryness at L2-3, without any evidence of nerve root compression and mild degenerative changes at facet joint L3-4; but, no evidence of disc herniation. (Tr. 117).

On February 15, 2006, plaintiff was examined by Dr. Onyiuke, Neurosurgery Associates for the University of Connecticut Health

---

[7]Plaintiff also reported that he had not received treatment for emotional or mental health problems that limited his ability to work. (Tr. 67).

7

Center.[8]   (Tr. 178-79). "All systems were reviewed and found to be negative." (Tr. 178).  "On examination, he is clearly overweight, but he has no focal motor deficits. An MRI scan of the lumbar spine was reviewed and was normal." (Tr. 178). The doctor opined that plaintiff had mild arthritis of his lumbar spine but did not require further surgical consultation or neurological intervention.  (Tr. 178-79).

Plaintiff provided treatment records from the Everyday Medical Center for January 10, 2006, through January 22, 2007.[9] (Tr. 158-77).  Treatment records from March 2, 2006, state that plaintiff refused physical therapy and was referred for pain management.  (Tr. 172). Treatment notes from April 14, 2006, state, "discuss pain management-meds refills?" (Tr. 171).  On May 15, 2006, plaintiff was seen at the UCONN Emergency Department for complaints of upper back pain after being hit by the structural frame of a porch and was prescribed Flexeril and released. Diagnosis: neck and back pain.  (Tr. 170).  Plaintiff was referred for pain management on August 22, 2006. (Tr. 168-69). Plaintiff was referred for an orthopedic consultation at UCONN by Everyday Medical Center.  (Tr. 163).  Treatment notes from December 8, 2006, note that plaintiff was seen by ortho and

---

[8]Plaintiff was referred to the University of Connecticut Health Center for a neurosurgery evaluation after an examination at the Everyday Medical Center.  (Tr. 173-77).

[9]Treatment notes dated January 10, 2006, state plaintiff's current medications were hydrocodone and Valium. (Tr. 173). Current medication listed on March 3 and April 14, 2006, was Motrin. (Tr. 171, 172).

they referred him back.[10]  (Tr. 162).  An "Excuse Slip" was
provided to plaintiff by Everyday Medical Center at the
conclusion of his appointment.  (Tr. 161).  Plaintiff was
referred to pain management on December 15, 2006 and January 22,
2007. (Tr. 159-60).  Treatment notes from January 22, 2007, state
in part, "35 year old with chronic lower back pain suffered in
motor vehicle accident 2000, he has made the rounds [of] physical
therapy, orthopedics . . . always in constant pain."[11]  (Tr.
158].

On September 13, 2006,  a lumbar MRI revealed only mild
osteoarthritic changes of the lower facets at L4-5 and L5-S-1,
normal signals throughout the visualized disks of lumbar spine
and spinal cord, with "no significant change in findings since
prior exam." (Tr. 167).

On March 21, 2007, Dr. Abbott of Connecticut Spine and
Sports Physicians examined plaintiff for his complaints of back
pain and right leg numbness. (Tr. 180-82).  Plaintiff rated his
pain as a "10" on a ten-point pain scale and reported the pain
was continuous and getting more severe. (Tr. 180).  Plaintiff
reported his "entire right leg is numb."  (Tr. 180).  "He has
deconditioning overall, and has difficulty using his right leg
due numbness however he can move his right leg" and did not
report tripping or falling because of the numbness.  (Tr. 180).

---

[10]Treatment notes from August 22, October 16, and December
8, 2006, note plaintiff was taking Motrin. (Tr. 162).

[11]Treatment notes from December 15, 2006 and January 22,
2007, note that plaintiff was taking Percocet. (Tr. 159).

He reported sitting and standing tolerance of 10 minutes, can
walk less than one block and reports he can lift almost nothing.
(Tr. 180). "Current medications" listed were Diclofenac,
Misoprostol, Oxycodone and Carisoprodol. "He reports despite all
of the narcotic medications and muscle relaxers he did not find
any of them to be helpful. He reports he is not able to take any
other muscle relaxers or other narcotics." (Tr. 181). Dr. Abbott
noted that plaintiff "does not clearly have MRI findings to
explain why he has numbness of the lower right extremity." (Tr.
182). Dr. Abbott offered an EMG/nerve conduction study to
evaluate his condition further; however, "he prefers only to get
medication at this time." (Tr. 182). Dr. Abbott added, "He does
appear to most likely have underlying depression contributing to
his overall inactivity and painful condition. Being
deconditioned is also a negative factor in him becoming more
functional." (Tr. 182). Plaintiff also declined treatment with
muscle relaxers, electric stimulation unit, transforaminal
epidural steroid injections, and a trial of Kadian. (Tr. 182).
"A trial of Kadian, which is a long acting morphine narcotic
medication, was offered to him; however he prefers to be on the
oxycodone therefore no prescriptions were written." (Tr. 182).

Consultative Examinations

On May 31, 2005, Dr. Abeles conducted a consultative
physical examination of plaintiff for Connecticut Disability
Determination Services (Tr. 118-19). Plaintiff complained of back
pain and occasional leg pain. (Tr. 118). Plaintiff reported

that he could stand or sit but not for prolonged periods and that
he could lift less than twenty pounds and reach "to a point."
(Tr. 118).  On examination, Dr. Ableles noted good neck motion,
normal hip motion, reasonably intact knee flexion and extension,
reflexes equal and symmetrical with normal heel and toe standing,
normal tandem gait. (Tr. 119). "Complaints of pain were voiced
with knee flexion initially. However, when he was told that hip
flexion was being tested, he no longer complained of pain.
Straight leg raising led to complaints of back pain."  (Tr. 119).
Plaintiff showed flexion to about 70 degrees and extension to
about 20 degrees. (Tr. 119).  Plaintiff complained of no
"vibratory sense, pin or dull touch when the right leg was tested
up to the knee. (Tr. 119). Dr. Ableles' impression was that these
complaints of back pain were "somewhat unusual.  It is unclear
whether this is organic or not. Previous medical notes would be
valuable to review."  (Tr. 119).

On June 8, 2005, Dr. Katherine Tracy reviewed Dr. Ableles'
report and plaintiff's earlier medical records. (Tr. 39, 129).
She concluded, based upon plaintiff's symptom magnification and
the lack of objective findings to support his stated back pain,
that plaintiff had no severe impairment ("NSI"). (Tr. 129).  On
August 23, 2005, Dr. Derrick Bailey reviewed plaintiff's records
and agreed with the previous conclusion that plaintiff had no
severe physical impairment.  (Tr. 130).

11

Mental Health Records

Plaintiff submitted no records for any mental health diagnosis or treatment.

On May 23, 2007, Dr. Losada-Zarate, a clinical psychologist, conducted a consultative psychological examination of plaintiff for the Connecticut Disability Determination Services (Tr. 155-57).  After examination, Dr. Losada-Zarate prepared a statement regarding plaintiff's ability to perform mental work-related activities. (Tr. 152-54).  Plaintiff denied any psychiatric hospitalizations or mental health treatment. "Criminal history was admitted to by stating that he had 2 convictions for possession of narcotics and that he was in prison for a period of 6 ½ years total." He was released from prison in July 2004.[12] (Tr. 155).

Plaintiff reported an employment history consisting of 4 jobs throughout his lifetime as a dishwasher, and in a pizzeria, construction and home remodeling.  (Tr. 156).  His longest held job was one year working at a pizzeria.  (Tr. 156).  Plaintiff reported that he stopped working in October 2000, because of

---

[12]Plaintiff's substance abuse history "consists of marijuana abuse from the age of 17 to the age of 22.  He used cocaine from the age of 18 to the age of 22. He stated that he used heroin from the age of 20 to the age of 30 and alcohol from the age of 17 until the year 2000."  (Tr. 155).

At the hearing, plaintiff testified that he has been sober since either January 2000 or January 2001. (Tr. 195).  The ALJ noted that if plaintiff used heroin until age thirty, that he turned thirty in 2002. (Tr. 195).  Plaintiff admitted to using five to ten bags of heroin a day and a gram to a half-gram of cocaine a day.  (Tr. 196-97).

injuries sustained in the accident. (Tr. 156).

Plaintiff's self-reported activities of daily living consist of managing his own funds, bathing, dressing (with assistance getting his socks on), watching television and listening to music. (Tr. 156). He stated his father assists him with bathing and his mother does that cooking and cleaning for him. (Tr. 156).

Plaintiff "stated that emotionally he feels depressed and worrisome . . . because of his physical condition." (Tr. 156). He was fully oriented and his thought process was goal directed and logical with no evidence of loose association or tangential thinking. (Tr. 156). "His mood appeared depressed with flat affect." (Tr. 156). His IQ scores were in the average range and he was functioning in the "above average range" in perceptual organization and working memory. (Tr. 156). Dr. Losada-Zarate concluded that "projective test findings revealed evidence of anxiety and depression." The diagnostic impression on Axis I was: adjustment disorder with mixed anxiety and depression. (Tr. 157). "It is recommended that Mr. Mariano consider the possibility of receiving a psychiatric evaluation in order to determine whether pharmacological intervention may be beneficial in addressing the underlying anxiety and depression. He may be able to engage in competitive employment as long as he is medically cleared to do so." (Tr. 157).

In completing a Medical Source Statement of Ability To Do Work-Related Activities (Mental), Dr. Losada-Zarate found that

13

plaintiff had no limitation in understanding, remembering, and carrying out simple or complex instructions or in making judgment or complex work related instructions. (Tr. 152).  She indicated that plaintiff had only mild limitations in interacting appropriately with the public, supervisors, co-workers and usual work situations and changes to routine work setting and no other capabilities were affected by his adjustment disorder.  (Tr. 153).  The Doctor added, "average intellectual functioning .  No evidence of cognitive impairment nor learning disorders.  There is evidence of an underlying depression and significant anxiety.  However, with medication and/or psychological treatment, he may engage in competitive employment as long as motivational factors do not interfere with the same."  (Tr. 152).

Hearing Testimony

On November 2, 2007, the plaintiff appeared with counsel at a hearing before ALJ Joseph Shortill.  (Tr. 183-219).

Vocational Expert James Parker

James Parker, a vocational rehabilitation consultant, testified at the hearing. (Tr. 210-19).  The only prior employment considered by Parker was "self-employed construction."[13]  (Tr. 211). Job duties included estimating, buying materials, writing proposals and reading blueprints and involved frequently lifting up to 25 pounds. (Tr. 211).  Plaintiff testified that he was self-employed in construction for

---

[13]Plaintiff told Dr. Losada-Zarate that his past employment included a job as a dishwasher and work at a pizzeria. (Tr. 156).

14

approximately one year.[14] (Tr. 212). The vocational expert
characterized Mariano's carpentry work as skilled work with
medium exertional requirements. (Tr. 214).

The first hypothetical the ALJ proposed was a person with a
BMI of 40 or 42, light lifting capacity, can stand and walk
approximately two hours in an eight hour day, sits and stands at
will, no limit to climbing ramps or stairs, never climbing ropes,
ladders or scaffolding because of back pain, with depression,
anxiety, obesity.  Balancing, stooping, kneeling, crouching and
crawling only occasionally, avoiding cold temperatures and
humidity/dampness, with concentration, persistence and pace
defects.  (Tr. 215). Limited to unskilled work, simple one and
two step tasks, simple, routine and repetitive tasks.  (Tr. 216).

In response to the ALJ's hypothetical, the vocational expert
concluded that plaintiff's  past relevant work could not be
performed because it was skilled and medium. (Tr. 216). "And we
have restrictions here to routine one and two step tasks with
further limitations with a light work capacity."  (Tr. 216).
However, he concluded that there was other work that existed both
locally and nationally, such as assembler of small products, DOT
706.684.022; electronics worker, DOT 726.687.010; retail store
price marker, DOT 209.587.034; and bottle label inspector, DOT
920.687.042. The bottle label inspector position, he testified,

---

[14]Plaintiff told Dr. Losada-Zarate that "his longest held
job was for 1 year at a pizzeria." (Tr. 156). An undated
Disability Report states that his longest employment was in
construction.  (Tr. 66).

was considered a light and unskilled position.  (Tr. 216A).

For positions that met the restrictions of sedentary and unskilled, the ALJ's second hypothetical, the vocational expert stated that retail store price marker would meet that criteria as well as a mall information clerk, DOT 237.367.046; vinyl assembler, DOT 713.687.018; and jewelry shop preparer, DOT 700.687.062.

The ALJ asked the vocational expert to assess whether claimant could work at either the medium or sedentary level positions if he experienced "chronic pain and perhaps depressive features that he has a moderate to severe limitation in his ability to maintain consistency, pace and concentration." (Tr. 217).  The vocational expert responded that if the limitation was moderate he could hold any of the jobs, "but if it progresses to marked or severe impairments in concentration, being able to complete one and two-step tasks, that would eliminate all work." (Tr. 217-18).

Finally, the ALJ asked the vocational expert to consider the same person with those problems, but to assume he had to "take frequent breaks, resting, rest periods, or say . . . he had moderate impairments . . . with consistency in pace and concentration, but had to take frequent rest periods due to the pain or particularly the pain.  By frequent I mean I would say, you know, maybe three times in an hour he had to take a five minute spell where he had to sit back and be off task."  (Tr. 218).  The vocational expert replied it would eliminate all work.

16

(Tr. 218).

### Disability and the Administrative Standard of Review

To be eligible for supplemental security income, Mr. Mariano must establish that he suffered from a disability within the meaning of the Social Security Act.  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Act does not contemplate degrees of disability or allow for an award based on partial disability.  Stephens v. Heckler, 766 F.2d 284, 285 (7th Cir. 1985). Mr. Mariano was disabled if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he could not engage in any other kind of substantial gainful work existing in the national economy.  42 U.S.C. §1382c(a)(3)(B).

To evaluate Mr. Mariano's case, the ALJ performed the sequential five-step analysis pursuant to 20 C.F.R. §§ 404.1520 and 416.920, to determine whether plaintiff was disabled under the Social Security Act. First, the claimant must not be working, and second, the claimant must have a "severe impairment." Third, if the impairment is one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, the claimant will be found disabled and the inquiry ends. Fourth, if

17

the claimant does not have a listed impairment, he must be incapable of continuing in his prior type of work. Fifth, there must not be another type of work the claimant can do. If the analysis is satisfied through step five, the Commissioner must find the claimant to be disabled. Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20 C.F.R. §§ 404.1520(b-f), 416.920(b-f). The burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step, if the analysis proceeds that far. Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (citations omitted).

The ALJ found that Mr. Mariano satisfied the first two steps. (Tr. 30).

At step three, the ALJ found that Mr. Mariano's impairments did not meet or medically equal, either singly or in combination, an impairment listed in the appendix to the regulations, 20 C.F.R., Part 404, Subpart P, Appendix 1, leading to an automatic finding of disability without further analysis. (Tr. 30).

The ALJ then assessed Mr. Mariano's residual functional capacity as required in step four. The ALJ found plaintiff retained the following RFC:

> to perform sedentary work except he needs to
> be allowed to sit and stand at will, he
> cannot climb ladders, ropes and scaffolding,
> and he should avoid extremes of temperature,
> humidity, and hazards.  He can only
> occasionally climb ramps and stairs, balance,
> kneel, crouch, crawl and stoop. He is limited
> to simple, unskilled work.

(Tr. 16). Thus, he is unable to continue in his prior work. (Tr.

18

19)

In making this determination, the ALJ found that the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 18).  He found, "there is substantial disparity between the claimant's complaints and he objective medical findings contained in the record." (Tr. 18). The ALJ undertook a detailed analysis of the medical evidence noting that diagnostic testing showed only mild disc bulging and no evidence of frank herniation or other significant findings; Dr. Pepperman refused to prescribe pain medications as requested by the claimant and cleared him to return to work; Dr. Gee advised claimant to return to work; Dr. Krompinger opined that the claimant's "degree of expressed disability appears to be out of proportion to our objective findings to date;" bone scan and MRI were normal; Dr. Krompinger reported that claimant was asking for narcotic pain medications and was using an unprescribed and unnecessary quad cane and that claimant was exaggerating his symptoms; March 2005 MRI showed only mild degenerative changes; Dr. Abele's March 2005 consultative exam noted that claimant had not received any treatment for allegedly disabling back pain for the past year; Dr. Abele noted good range of motion of neck, hips and upper extremities, but some loss of motion of the lumbar spine, with no evidence of neurological deficits, normal gait and able to walk on heels and toes.  Dr. Onyiuke's February 2006 report found claimant's low back complaints unremarkable with mild arthritis

19

of the lumbar spine; September 2006 MRI showed no significant changes; Dr. Abbott's February 2007 records note deconditioning, diagnostic testing did not confirm a clear reason for the complaints, claimant declined EMG testing or any treatment other than Oxycodone. (Tr. 18).

The ALJ carefully noted Dr. Losada-Zarate's evaluation for anxiety and depression in May 2007, finding claimant had average intellectual functioning with no evidence of cognitive impairment but, rather, underlying anxiety and depression associated with an adjustment disorder, and that "with medication and/or psychological treatment, he may engage in competitive employment as long as motivational factors do not interfere with the same." The doctor noted that the claimant had only mild limitations relative to ability to do work related activities.  The ALJ concluded,

> As for the opinion evidence, no treating or examining physician has suggested that the claimant has any physical or mental impairment which prevents him from working. Moreover, given its inconsistency with the medical evidence of record, the claimant's testimony is found to be insufficient to support the conclusion that the claimant has limitations greater than those just identified.

(Tr. 19).

Finally, the ALJ found at step five that, "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy that the claimant can perform." (Tr. 19). See 20 C.F.R. § 416.960(c) and 416.966. The ALJ noted

that if "the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." (Tr. 20). The ALJ noted that he asked the vocational expert to consider how claimant's non-exertional limitations "erode the unskilled sedentary occupational base" and the vocational expert testified that "given all these factors," claimant would be able to perform the requirements of representative occupations such as a final assembler, preparer, and mall information clerk. (Tr. 20). The ALJ found that the "vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (Tr. 20). Based on the testimony of the vocational expert, the ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and found that the plaintiff is not disabled. (Tr. 20).

## STANDARD OF REVIEW

The Social Security Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. §1383(c)(3). This is not review de novo -- the Court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner.

See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).
Primarily, the Court reviews the decision to determine whether
the Commissioner applied the correct legal standard. Tejada v.
Apfel, 167 F.3d 770, 773 (2d Cir. 1999). See also Johnson v.
Bowen, 817 F.2d 983, 986 (2d Cir. 1987) (where the ALJ failed to
apply correct legal principles, his finding cannot be upheld even
if there is substantial evidence for it).

Secondly, the Court reviews whether the Commissioner's
determination was supported by substantial evidence. Tejada, 167
F.3d at 773. "Substantial evidence" is evidence that a reasonable
mind would accept as adequate to support a conclusion; it is
"more than a mere scintilla." Richardson v. Perales, 402 U.S.
389, 401 (1971), quoted in Pollard v. Halter, 377 F.3d 183, 188
(2d Cir. 2004).  The Court considers the entire administrative
record, including new evidence submitted to the Appeals Council
following the ALJ's decision.  Perez v. Chater, 77 F.3d 41, 46
(2d Cir. 1996). To enable a reviewing court to decide whether the
determination is supported by substantial evidence, the ALJ must
set forth the crucial factors with sufficient specificity.
Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  This
includes a determination that the testimony of any witness is not
credible.  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-
61 (2d Cir. 1988).

DISCUSSION

Plaintiff asserts the following errors on appeal,

1.   The ALJ erroneously determined that plaintiff's
     condition does not meet or equal the listings of
     impairments made applicable to SSI claimants by 20
     C.F.R. §416.925;

2.   The defendant failed to consider all evidence of
     limitations and restrictions and failed to make every
     effort to ensure that the file contained sufficient
     evidence to deny a finding of disability under the
     listing at 20 C.F.R. Part 404, Subpart P, Appendix 1
     ("listings"), 12.00 D. 04 as required by 20 C.F.R.
     §§416.926 and 416.913(e), or otherwise;

3.   The defendant erroneously determined that plaintiff is
     not disabled because his psychological impairment "may
     be amenable to treatment";

4.   The defendant failed to develop a full and fair record
     as it failed to supplement the medical source
     information with information from one or more of
     plaintiff's parents; and

5.   The decision is not supported by substantial evidence.
(Doc. #22 at 6).

     Specifically, plaintiff argues that his "depression
qualifies him as disabled as a matter of law as it meets or
equals the listings for an affective disorder consisting of his
depression with loss of interest in almost all of life's

23

activities, sleep disturbance and difficulties concentrating or thinking . . . [and he] has the necessary accompanying marked difficulties in activities of daily living, and maintaining concentration, persistence or pace to meet the listings of 12.04." (Doc. #22 at 7).

A.    Reliance Upon Proper Evidence

Plaintiff has alleged that some evidence was ignored, misread, or improperly relied upon by the ALJ, and/or that the ALJ failed to fully and fairly develop the record, arguing that the case must be remanded. The ALJ is charged with the duty of weighing the evidence of record, resolving any material conflicts in the evidence and testimony. See Richardson v. Perales, 402 U.S. 389, 399 (1971), cited in Stevens v. Barnhart, 473 F. Supp. 2d 357, 364 (N.D.N.Y. 2007).

1.    Alleged Failure to Develop the Record

Plaintiff challenges the ALJ's decision based on his failure to fully and fairly develop the evidentiary record "on the extent of plaintiff's psychological impairments and his ability to perform basic life activities." (Doc. #22 at 14-16). "[I]n light of the essentially non-adversarial nature of a Social Security disability hearing, the Commissioner has an obligation to develop a complete medical record before making a decision." Wright v. Barnhart, 3:05CV1487(SRU)(WIG), 2006 WL 4049579, *15 (D. Conn. Dec. 14, 2006) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)).

24

Plaintiff argues that the ALJ should have called plaintiff's mother to testify to "supply material evidence about the extent of plaintiff's psychological impairments and his ability to perform basic life activities." (Doc. #22 at 15).

However, the Court finds "little indication in the record suggesting a disabling mental disorder during the period in question that would have obliged the ALJ to develop the record further." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). The record contains no treatment records or diagnosis from a treating physician or treating mental health professional for adjustment disorder or depression.  The ALJ arranged to have a consultative psychological evaluation of plaintiff conducted after he requested a hearing. (Tr. 19, 155). Plaintiff was represented by counsel at the hearing.  Plaintiff's counsel did not call any witnesses other than Mariano.  Plaintiff's counsel had the duty to determine which witnesses to present on behalf of plaintiff's disability claim. Although plaintiff testified regarding his difficulties with activities of daily living, driving, cooking, dressing, grooming, cleaning, grocery shopping, sleeping, concentration, he did not indicate that this was a result of being too depressed to do them but rather because of pain.[15]  (Tr. 198-202, 209).  The record does not show that the

---

[15]"My concentration is affected by the pain." (Tr. 209).  "I could be maybe watching T.V. I could probably [tell] you what's going on , but I can't probably give you all the full details.  I could give you probably a touch of what happened, but I told the psychiatrist that, you know, I'm not mentally insane. I have a back problem and that's why . . . . " (Tr. 209).

testimony from plaintiff's mother was required in light of
plaintiff's testimony and the medical evidence in the record.

    2.   <u>Alleged Failure to Consider All the Evidence</u>

    Plaintiff next argues that the ALJ misread the psychological
evaluation done by Dr. Losada-Zarate and failed to consider all
of the evidence of Mr. Mariano's depression in finding that
plaintiff's impairments did not meet or equal a listing.

    Plaintiff also asserts that the ALJ ignored a diagnosis of
depression, which he claims would have led to a finding of
disability. No such diagnosis exists.  Plaintiff provided no
other treatment records for depression. His sole evidence is from
Dr.  Losada-Zarate, a consultative psychologist.[16] (Tr. 152-157).
Although the ALJ did not cite every finding contained in Dr.
Losada-Zarate's report, he addressed her report in great detail
in his decision  (Tr. 19), and concluded with ample evidentiary
support that plaintiff had only mild limitations relative to his
ability to do work-related activities. (Tr. 19, 153).

    Therefore, the Court is not persuaded that the ALJ either
misread or failed to consider facts in the record, and finds that
he properly relied upon the record as substantial evidence for
his findings. The Court will address whether the ALJ properly
found that plaintiff's impairments did not meet or equal a

---

    [16]Dr. Abbott, a consulative physician, stated that Mariano
appeared to "most likely have underlying depression contributing
to his overall inactivity and painful condition." (Tr. 182). Dr.
Abbott noted that plaintiff refused muscle relaxants, electric
stimulation, EMG/nerve conduction study, epidural steroid
injuctions, trial of Kadian; "he prefers to go on Oxycodone
therefore no prescriptions were written." (Tr. 182).

listing below.

B.  The ALJ's Legal Analysis

    1.   The Impairment Finding

The plaintiff next argues that the ALJ erred in not
concluding that plaintiff's impairments met or equaled those set
forth in Listing 12.04, which deals with Affective Disorders. To
be found disabled under this listing, a plaintiff must meet or
equal the criteria of both 12.04 A and B. To satisfy the demands
of 12.04 B, a plaintiff must prove that his restrictions are
"Marked." The regulation, therefore, implicitly vests the
Commissioner with discretion to evaluate the degree and extent of
claimed restrictions. There is ample evidence to support a
finding that plaintiff's restrictions were not sufficiently
severe to be "marked" within the meaning of the regulation.

Among the evidence in the record to support this conclusion
is Dr. Losada-Zarate's "Medical Source Statement of Ability to Do
Work-Related Activities (Mental)", finding to the extent
plaintiff might have psychiatric issues, they were not
sufficiently significant to preclude employment.  Consulting
psychologist Dr. Losada-Zarate specifically notes that
plaintiff's restrictions and difficulties are "none" or "mild,"
not "marked."  (Tr. 152-53).  There had been no treatment for
depression or anxiety and there is no diagnosis.  The only
evidence relied on by Dr. Losada-Zarate is her consultative exam
of plaintiff and his self-reported symptoms. As noted earlier in

this opinion, plaintiff testified that his restrictions in daily living were attributable to pain.  (Tr. 198-202, 209).  The ALJ is not required to believe plaintiff's testimony about the extent of his claimed restrictions. His analysis satisfies the "substantial evidence" standard.

    2.   <u>The Medical-Vocational "Grids" Framework</u>

The Court also finds that the ALJ properly applied the grids to determine whether significant jobs were available that the plaintiff could perform with his RFC. Under the Social Security Act, the Commissioner bears the burden of proof for the fifth and final step of the disability determination. The grids take into account a claimant's RFC, age, education, and work experience. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a); 20 C.F.R. § 404.1569a(a).  "'Generally speaking, if a claimant suffers only from exertional impairments, e.g., strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable grids.  For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled.'"  <u>Rosa v. Callahan</u>, 168 F.3d 72, 82 (2d Cir. 1999) (quoting <u>Pratts v. Chater</u>, 94 F.3d 34, 38-39 (2d Cir. 1996)).  However,

> where the claimant's work capacity is
> significantly diminished beyond that caused
> by his exertional impairment the application
> of the grids is inappropriate. By the use of
> the phrase "significantly diminish" we mean
> the additional loss of work capacity beyond a
> negligible one or, in other words, one that
> so narrows a claimant's possible range of
> work as to deprive him of a meaningful
> employment opportunity.

28

Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986), quoted in
Rosa, 168 F.3d at 82.

However, as noted previously, the medical record indicates
that the plaintiff does not suffer debilitating depression or
adjustment disorder.

Furthermore, the ALJ did not find that the plaintiff
suffered no non-exertional limitations, but rather that his non-
exertional limitations do not compromise his capacity for
sedentary work. (Tr. 20). For example, the ALJ noted  that the
plaintiff has non-exertional limitations that may "erode" his
unskilled sedentary occupational base, (Tr. 20), but found that
plaintiff's non-exertional limitations did not meet the
"significantly diminish" standard set forth in Bapp, 802 F.2d at
606. The ALJ relied upon substantial evidence for this RFC
determination, as required. See Richardson, 402 U.S. at 401. The
Court sustains the ALJ's finding that there were no
incapacitating non-exertional limitations that would prevent the
ALJ's use of the grids to find other work available to the
plaintiff.

Therefore, the Court finds no cause to remand the case for
the development of further evidence.


   3.   Credibility Assessment

The function of the Commissioner includes evaluating the
credibility of all witnesses, including the claimant.  See
Carroll v. Secretary of Health and Human Services, 705 F.2d 638,

642 (2d Cir. 1983).  Although the Commissioner is free to accept
or reject the testimony of any witness, a "finding that the
witness is not credible must nevertheless be set forth with
sufficient specificity to permit intelligible plenary review of
the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255,
260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643). The
ALJ's findings must be consistent with the other evidence in the
case.  Id. at 261. See also 20 C.F.R. §§ 404.1529(a), 416.929(a).

In making a disability determination, all symptoms,
including pain, must be considered.  20 C.F.R. § 404.1529(a).  In
evaluating subjective symptoms, a claimant's statements are to be
considered only to the extent that they are consistent with
medical evidence.  20 C.F.R. §§ 404.1529(a), 416.929(a). However,
statements about the intensity and persistence of pain and
symptoms will not be rejected simply because the objective
medical evidence does not support the claim.  20 C.F.R. §
404.1529(c)(2).  Other factors which will be considered include
the claimant's medical history, diagnoses, daily activities,
prescribed treatments, efforts to work, and any functional
limitations or restrictions caused by the symptoms.  See 20
C.F.R. § 404.1529(c)(3).  In addition,

> [t]he determination or decision must contain
> specific reasons for the finding on
> credibility, supported by evidence in the
> case record, and must be sufficiently
> specific to make clear to the individual and
> to any subsequent reviewers the weight the
> adjudicator gave to the individual's
> statements and the reasons for that weight.

SSR 96-7p[17].

The ALJ gave specific reasons for finding that the plaintiff's testimony was not fully credible.[18]  Therefore, the ALJ's finding of functional limitation but no disability is consistent with the medical record, despite plaintiff's allegations to the contrary.  The record does not show that plaintiff experienced an episode of decompensation related to depression or that he had any "marked" limitation related to depression.  On this record, the ALJ appropriately considered plaintiff's subjective complaints.

Therefore, the Court agrees with the ALJ's applications of

---

[17] Available at http://www.ssa.gov/OP_Home/rulings/di/01/SSR96-07-di-01.html.

[18]The ALJ found that

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.  There is substantial disparity between the claimant's complaints and the objective medical findings contained in the record.  The undersigned finds that the claimant's complaints of constant, incapacitating pain are neither reasonably consistent with those medical findings, nor sufficient[] as additive evidence to support a finding of disability.  Moreover, the claimant's ability to manage a wide range of daily activities belies his allegation of total disability. It is noted that the claimant came to the hearing using a cane, but he admitted it was not prescribed by his doctor.

(Tr. 18).

31

the legal principles regarding the plaintiff's credibility, and finds that the ALJ relied upon substantial evidence to arrive at his finding of no disability.

CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings **[Doc. #22]** is **DENIED** and Defendant's Motion to Affirm the Decision of the Commissioner **[Doc. #24]** is **GRANTED.**

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989) (per curiam); FDIC v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

ENTERED at Bridgeport this 19th day of February 2010

```
          /s/
_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
```